J-A01007-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JUSTIN PATTERSON | |
| Appellant | No. 2768 EDA 2014 |

Appeal from the Judgment of Sentence April 14, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0011152-2009

BEFORE: LAZARUS, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED February 22, 2016**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's conviction on the charges of aggravated assault, firearms not to be carried without a license, carrying firearms on public streets or public property in Philadelphia, possessing instruments of crime, and possession of a firearm prohibited.[1] Appellant contends (1) the trial court erred in admitting into evidence at trial a 911 call recording of an unidentified person; (2) the trial court erred in ruling that the prosecutor's comment during closing argument did not constitute prosecutorial misconduct; (3) the trial court erred in permitting the Commonwealth to "play the sympathy and emotion card" during its

---

[1] 18 Pa.C.S.A. §§ 2702, 6106, 6108, 907, and 6105, respectively.

*Former Justice specially assigned to the Superior Court.

direct examination of the victim's father; and (4) the trial court erred in refusing to give a "missing witness" jury instruction.[2]  We affirm.

The relevant facts and procedural history are as follows:  On March 31, 2009, Arcenio Alvarado was shot approximately nine times, leaving him paralyzed from the chest down.  Following an investigation, which included information received from an anonymous 911 caller, the police arrested Appellant as the shooter.  Thereafter, Appellant made a signed, recorded statement to the police, explaining that he shot Mr. Alvarado three or four times following a verbal altercation.[3]

Appellant filed a counseled pre-trial motion *in limine* seeking to exclude the introduction of the 911 tape; however, the trial court denied the motion.  Thereafter, represented by counsel, Appellant proceeded to a jury trial, during which the 911 recording from the anonymous caller was played. At the conclusion of the trial, Appellant was convicted of the offenses indicated *supra*, and on April 14, 2014, the trial court sentenced him to an aggregate of eleven years to twenty-two years in prison.  On April 24, 2014, Appellant filed a timely, counseled post-sentence motion, which was denied

_____

[2] On October 30, 2015, the Commonwealth filed a "Motion For Leave to File Brief Out of Time."  We grant the motion.

[3] In his police statement, Appellant indicated that, on the night in question, he was with a man named Antwon Andrews, who shot the victim an additional five or six times.  However, since the only information the police had concerning Mr. Andrews' alleged participation was Appellant's uncorroborated statement, the police did not arrest Mr. Andrews.  Trial Court Opinion, filed 5/11/15, at 2 n.2.

by operation of law on August 25, 2014. This timely, counseled appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

Appellant's first contention is that, over defense counsel's objection, the trial court erred in admitting into evidence at trial the 911 tape from the anonymous caller. In an undeveloped, one paragraph argument, Appellant suggests the 911 tape was inadmissible hearsay, and since "there was no required 'sufficient corroboration,'" the tape did not qualify for the excited utterance or the present sense impression exceptions. **See** Appellant's Brief at 8. In response, the Commonwealth avers Appellant has waived his claim, and alternatively, the claim lacks merit.

We agree with the Commonwealth that Appellant's undeveloped, conclusory argument hampers meaningful review. **Commonwealth v. McMullen**, 745 A.2d 683 (Pa.Super. 2000) (holding blanket assertions of error are insufficient to permit meaningful review). Moreover, we note that, although the trial transcript indicates a 911 tape was played in open court for the jury, N.T. Trial, 2/18/14, at 23, the recording was not properly transcribed.[4] Furthermore, we have not been provided with the tape.

_____

[4] The trial court acknowledged in its opinion that the 911 tape was not properly transcribed. The trial court further indicated that "[a]s a courtesy," it listened to the tape and set forth in its opinion an "unofficial" transcription. Trial Court Opinion, filed 5/11/15, at 4 n.3. In essence, according to the trial court's transcription, the 911 caller indicated that somebody had just been shot at the intersection of Marshall and Tioga Streets, and the male shooter drove off in a gray, four-door Buick. **Id.** at 4-5.

Accordingly, we find Appellant's challenge to the admissibility of the 911 tape to be waived.[5] ***Commonwealth v. Preston***, 904 A.2d 1, 7 (Pa.Super. 2006) ("Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty.") (citation omitted)).

Appellant's next contention is the trial court erred in ruling the prosecutor's comment during closing argument did not constitute prosecutorial misconduct. Specifically, Appellant contends the prosecutor committed misconduct when, during closing argument, he stated, "'Did Mr. Coard (i.e., defense counsel) ask about violence when he questioned the detective?'" Appellant's Brief at 9. In response, the Commonwealth advocates waiver of Appellant's claim. We agree that the claim is waived.

Preliminarily, we note that, though indicating closing arguments occurred on February 20, 2014, Appellant has not provided this Court with

_____

[5] In any event, based on our review of the 911 call, as set forth in the trial court's opinion, we agree with the trial court that there was evidence adduced at trial containing sufficient "other corroborating evidence" to justify its admission. Trial Court Opinion, filed 5/11/15, at 7; ***Commonwealth v. Hood***, 872 A.2d 175 (Pa.Super. 2005) (suggesting that under either the excited utterance or present sense impression exception there must be sufficient independent corroborating evidence to permit admission). As the trial court indicated, the 911 caller's description of the fleeing vehicle "mirrored" the description provided by another witness, and the police found the victim at the intersection of Marshall and Tioga Streets, where the 911 caller indicated the shooting had occurred. ***See*** Trial Court Opinion, filed 5/11/15, at 7.

the relevant page of the notes of testimony where the prosecutor's statement, as well as defense counsel's necessary objection, may be located. *See* Appellant's Brief at 9. Moreover, we note Appellant provided this Court with a truncated transcript from February 20, 2014, which included only a portion of the prosecutor's closing statement. Nevertheless, we independently reviewed the portion of the prosecutor's closing statement, which was provided to this Court, and have been unable to locate the prosecutor's statement or defense counsel's objection. Thus, Appellant's claim is waived on this basis. *See Preston*, 904 A.2d at 7 ("In the absence of an adequate certified record, there is no support for an appellant's arguments and, thus, there is no basis on which relief could be granted.").

Additionally, as the Commonwealth astutely notes, Appellant's one paragraph appellate argument is devoid of necessary development, thus hampering meaningful review. *See McMullen*, *supra*. Simply put, Appellant's bald, conclusory assertions of error do not warrant relief.[6]

Appellant's next contention is the trial court erred in permitting the Commonwealth to "play the sympathy and emotion card" during its direct examination of the victim's father and erred in failing to give a curative

---

[6] Assuming, *arguendo*, Appellant's claim of prosecutorial misconduct during closing arguments is not waived for appellate review, we note the trial court, in its Pa.R.A.P. 1925(a) opinion, adequately addressed the claim, concluding Appellant is not entitled to relief. *See* Trial Court Opinion, filed 5/11/15, at 10-12.

instruction. In this regard, Appellant contends the Commonwealth improperly asked the victim's father about the victim's injuries and condition after the shooting, as well as about the victim's subsequent medical care at home. In response, the Commonwealth advocates waiver of Appellant's claim on the basis he presented an undeveloped, one paragraph argument.

We agree with the Commonwealth that Appellant's lack of development hampers review. **See McMullen**, **supra**. In any event, we have reviewed the direct examination of the victim's father, Adriel Alvarado. Appellant lodged three objections to Mr. Alvarado's direct examination testimony:

> **Q:** Sir, when you—did you actually physically touch [the victim] at that point?
> **A:** No.
> **[DEFENSE COUNSEL]:** Objection.
> **THE WITNESS:** No.
> **[DEFENSE COUNSEL]:** Relevance.
> **THE COURT:** Sustained.
> **Q:** When you saw [the victim], how close to [him] did you get?
> **A:** Like this. Like she's right there.
> **Q:** Okay. And let me ask you the relevance of that. Did you see the injuries to [the victim].
> **A:** No. I just seen the pool of blood.
> **Q:** Okay. Describe where you saw the pool of blood on [the victim].
> **[DEFENSE COUNSEL]:** Objection.
> **THE COURT:** Basis?
> **[DEFENSE COUNSEL]:** Relevance, Your Honor.
> **THE COURT:** Counsel, what is the relevance.
> **[PROSECUTOR]:** The injuries to this man, we're establishing the corpus through this man. That's the relevance.
> **THE COURT:** Overruled.
> **THE WITNESS:** His upper torso all shot up.
> ***

**Q:** The condition of your son now, I'm going to go back to that date in just a second. The condition of your son now to the day that we are standing here in court and questioning, has your son from the day of the shooting been able to walk?

**A:** No, he's paralyzed from his chest down.

**Q:** Okay. Let me ask you about the conditions in your home. Where is your son? Is your son at home with you now?

**A:** Yes.

**[DEFENSE COUNSEL]:** Objection. Relevance, Your Honor.

**THE COURT:** Overruled.

**Q:** And in terms of the care of your son, could you tell us, where does your son sleep?

**A:** He's in the living room in the corner in the hospital bed with all of his machines, but still with his air mattress.

N.T. Trial, 2/12/14, at 30-31, 38-39 (bold in original).

With regard to Appellant's first objection, the record reveals the trial court sustained the objection. Contrary to Appellant's assertion, Appellant did not request a curative instruction. *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726 (2004) (indicating the failure to request a curative instruction constitutes a waiver of the claim of trial court error in failing to issue a curative instruction).

With regard to Appellant's second and third objections, which were based on relevancy, the record reveals the trial court overruled the objections.

It is well settled that questions concerning the admissibility of evidence lies within the sound discretion of the trial court, and we will not reverse the court's decision on such a question absent a clear abuse of discretion. *Commonwealth v. Maloney*, 876 A.2d 1002, 1006 (Pa.Super. 2005). An abuse of discretion is not merely an error of judgment, but is

rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record. **Commonwealth v. Cameron**, 780 A.2d 688 (Pa.Super. 2001).

Before any evidence is admissible in a criminal proceeding, it must be competent and relevant. **Commonwealth v. Freidl**, 834 A.2d 638 (Pa.Super. 2003). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." **Commonwealth v. Williams**, 91 A.3d 240, 242 (Pa.Super. 2014) (quoting Pa.R.E. 403).

In finding the evidence to be relevant, the trial court noted that Mr. Alvarado's testimony that he observed the victim lying in a pool of blood immediately after the shooting, as well as the fact the victim was paralyzed and living with assistance at his parents' home some time after the shooting, was relevant to show the victim suffered "serious bodily injury" for purposes of aggravated assault. **See** Trial Court Opinion, filed 5/11/15, at 14. We find no abuse of discretion in this regard.

To the extent Appellant suggests the evidence was overly emotional such that its probative value was outweighed by its prejudicial effect, we agree with the trial court that any prejudice from the admission of the evidence was not an unfair result of a jury's potential emotional response but was, instead, a fair result from the nature of Appellant's act itself. Accordingly, Appellant is not entitled to relief on this claim.

Appellant's final contention is the trial court erred in refusing to give a "missing witness" jury instruction as it relates to the victim, who did not testify at trial. In response, the Commonwealth advocates waiver of the claim. We agree with the Commonwealth that this claim has been waived for appellate review.

As indicated *supra*, Appellant has provided this Court with only a portion of the notes of testimony from the February 20, 2014, proceedings. While his pre-instruction request for, and the trial court's denial of, the "missing witness" instruction is included in the notes provided to us, **see** N.T. Trial, 2/20/14, at 4-6, the trial court's actual charge to the jury, and any corresponding objection to the actual charge, are not included therein. **See Commonwealth v. Pressley**, 584 Pa. 624, 632, 887 A.2d 220, 225 (2005) ("[T]he mere submission and subsequent denial of proposed points for charge that are . . . omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points.") (footnote omitted));

- 9 -

***Commonwealth v. Parker***, 104 A.3d 17, 29 (Pa. Super. 2014) (indicating even where an appellant objects to an instruction during the charging conference, the appellant must object to the actual instruction after it is given in order to preserve claims of error); ***Preston***, 904 A.2d at 7 (indicating it is the appellant's responsibility to ensure this Court is provided with the necessary materials to permit review).

Additionally, Appellant's one paragraph appellate argument is devoid of necessary development, thus hampering meaningful review. ***See*** ***McMullen***, ***supra***. Simply put, Appellant's bald, conclusory assertions of error with respect to the jury instruction do not warrant relief.[7]

For all of the aforementioned reasons, we affirm. We direct the parties to attach a copy of the trial court opinion in the event of further proceedings.

Affirmed.

---

[7] Assuming, *arguendo*, Appellant claim that the trial court erred in refusing to instruct the jury with the "missing witness" charge as it relates to the victim is not waived for appellate review, the trial court adequately addressed the claim, concluding Appellant is not entitled to relief. ***See*** Trial Court Opinion, filed 5/11/15, at 15-17.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/22/2016

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-51-CR-0011152-2009

    :

V.     :     2768EDA 2014

    :     **FILED**

JUSTIN PATTERSON     :

    :     MAY 1 1 2015

    :     Criminal Appeals Unit
First Judicial District of PA

**OPINION**

May 8, 2015

KENNEDY, SEAN F., J.

**FINDINGS OF FACT**

On March 31, 2009, Arcenio Alvarado ("Arcenio") was shot approximately nine times, leaving him paralyzed from the chest down. N.T. 2/12/2014 at 31, 38. A witness at the scene informed police that the shooter drove off in a gray Buick. *Id* at 57, 63–64. A caller to 9-1-1 articulated the same.[1] The Crime Scene Unit found 16 pieces of ballistic evidence (i.e., bullet casings or fragments) related to the shooting. N.T. 2/12/2014 at 85. Fifteen of the pieces were found at the crime scene; another was found in the patrol car that transported Arcenio to the hospital. *Id*. at 85, 92. Some of the ballistic pieces were manufactured by Winchester. *Id*. at 87–96. All ballistic pieces, however, were fired from a 9 mm handgun. N.T. 2/19/2014 at 26. Police also recovered from the scene one plastic Ziploc-type packet, containing a white rock-like substance. N.T. 2/18/2014 at 13. Several packets of the same substance were also recovered from Arcenio's jacket. *Id*. at 14.

---

[1] *See* 9-1-1 transcript provided *infra*.

1

As a result of an interview with Arcenio, police obtained an arrest warrant for Justin Patterson (the "Defendant"), and arrested him at his home. N.T. 2/18/2014 at 26, 29. There, the police retrieved one Winchester box of fifty 9 mm rounds of ammunition. *Id.* at 32. The ammunition found in the Defendant's home was compatible with a 9 mm handgun. N.T. 2/19/2014 at 26.

After waiving his rights to remain silent and to have an attorney present, the Defendant gave police a signed, recorded statement. N.T. 2/18/2014 at 48–60; N.T. 2/19/2014 at 44. In his statement, the Defendant recounted that on the night of the shooting, he was with a man named Antwon.[2] N.T. 2/18/2014 at 58. On this particular evening, Antwon informed the Defendant that he had a "beef" with Arcenio. *Id.* The reasons for the "beef" allegedly included Arcenio owing Antwon money, and because Antwon and Arcenio were involved with the same woman. *Id.*

With the Defendant driving, Antwon and the Defendant drove through the neighborhood and parked about a block from where Arcenio would later be shot. *Id.* Antwon then called Arcenio on his cell phone and asked to meet. *Id.* When Arcenio came around the corner to meet, Antwon informed the Defendant that he planned to rob Arcenio. *Id.* The Defendant admitted that he replied, "okay" in response to Antwon's robbery declaration. *Id.*

According to the Defendant, when Arcenio arrived, Antwon and Arcenio began to argue. *Id.* The Defendant claimed that during the argument, Arcenio started to back up and reach for something in his pocket. *Id.* at 59. At that moment, the Defendant and Antwon drew their firearms and shot Arcenio. *Id.* at 59. Although the Defendant claimed Arcenio was reaching for something, insinuating that it may have been a weapon, police found no weapons on Arcenio or

---

[2] Antwon was later identified as Antwon Andrews. The Defendant selected Antwon Andrews's photograph from a police photo array. N.T. 2/18/2014 at 62; N.T. 2/20/2014 at 10. The police later tried to interview Antwon, but he was unwilling to talk. N.T. 2/18/2014 at 82. Because the only information the police had on Antwon were uncorroborated statements from the Defendant, the police did not have enough for an arrest warrant. *Id.* at 82, 119.

2

at the shooting scene. N.T. 2/12/2014 at 53; N.T. 2/18/2014 at 96. The Defendant claimed that he shot Arcenio about three or four times; and that Antwon shot Arcenio approximately five or six times. N.T. 2/18/2014 at 66.

In his statement, the Defendant claimed that both he and Antwon used a 9 mm handgun in the shooting. *Id.* at 61, 63. The Defendant did not have a license to carry a firearm. *Id.* at 126. After the shooting, the Defendant drove Antwon to a nightclub and then drove home. *Id.* at 59. The Defendant placed his firearm in a parking lot dumpster adjacent to his apartment building. *Id.* at 63. The Defendant admitted that he drove his cousin's gray 1992 Chevrolet Caprice Classic the night of the shooting. *Id.* at 64. In his statement to police, he agreed that the Chevrolet Caprice Classic is similar to a four-door gray Buick. *Id.* at 65.

## PROCEDURAL HISTORY

On February 21, 2014, before the Honorable Sean F. Kennedy, a jury found the Defendant guilty of Aggravated Assault (18 Pa.C.S.A. § 2702); firearms not to be carried without a license (18 Pa.C.S.A. § 6106); carrying firearms on public streets or public property in Philadelphia (18 Pa.C.S.A. § 6108); and possessing instruments of crime (18 Pa.C.S.A. § 907). The Trial Court subsequently found the Defendant guilty of VUFA—possession of a firearm prohibited (18 Pa.C.S.A. § 6105). The Court sentenced the Defendant to a period of incarnation of 10–20 years for the Aggravated Assault; and a consecutive period of incarceration of one–two years on the VUFA. The Court gave no punishment for the remaining counts. On April 24, 2014, the Defendant filed a Post-Sentencing Motion, seeking a judgment of acquittal, or, in the alternative, a new trial. The Defendant thereafter filed a Notice of Appeal and a Statement of Errors Complained of on Appeal.

## DISCUSSION

3

In the Defendant's Statement of Matters Complained of on Appeal, the Defendant asserted the following arguments: (1) inadmissibility of the 9-1-1 call recording; (2) prosecutorial misconduct—(a) that the Commonwealth's statement to the jury shifted the burden of proof; and (b) that the Commonwealth improperly played the "sympathy and emotion card" by inquiring about the Complainant's injuries and condition after the shooting and about subsequent medical care at home—and (3), a missing witness instruction.

## I. The Court properly admitted the 9-1-1 recording.

### a. The 9-1-1 recording was admissible hearsay with sufficient corroboration.

The Defense maintains that the 9-1-1 recording played for the jury was inadmissible because it lacked sufficient corroboration. The relevant statements on the recording were made to a 9-1-1 operator on March 31, 2009. The call, logged in at 10:07 p.m., is as follows:[3]

> 9-1-1 OPERATOR: [Inaudible].
> CALLER: [Inaudible] Somebody just got shot right here on Tioga [Street]. Marshall [Street] and Tioga. Please somebody [inaudible]. Yes Marshall and Tioga.
> 9-1-1 OPERATOR: Did you see who did it?
> CALLER: No. The guy is about to take off, if somebody come, he's . . . he's driving a Buick, like a Buick. He's right now on Venango [Street] and Tioga.
> 9-1-1 OPERATOR: What color is the Buick?
> CALLER: It's gray. It's gray. He just . . . he just kept on straight. He's going up, right now, he's going up, right now, Seventh . . . Marshall [inaudible], he's going up . . .
> 9-1-1 OPERATOR: Is he on Marshall or Tioga?
> CALLER: It's a Buick. He's driving a white, um, gray Buick.
> 9-1-1 OPERATOR: Gray Buick, right. Is he on Tioga or on Marshall?

---

[3] Although played for the jury at trial, the contents of the 9-1-1 recording were not recorded into the record by the court stenographer. N.T. 2/18/2014 at 23. As a courtesy, the Trial Court, in preparation of this appeal, transcribed the 9-1-1 recording and provided the following transcript. Having appreciation for the obvious difficulty in transcribing a recording, the Trial Court acknowledges that the potential exists for disagreement over the transcript's precision.

4

CALLER: On Marshall. He's on Marshall.

9-1-1 OPERATOR: [Inaudible] On Marshall?

CALLER: He just made a left on Venango.

9-1-1 OPERATOR: Left?

CALLER: Down Venango Street, toward Broad Street.

9-1-1 OPERATOR: The person on the highway, where was he shot at?

CALLER: It was a Buick. It was a Buick. It was a gray, four-door, Buick.

9-1-1 OPERATOR: Ok. The person on the highway, is he . . . where was he shot at?

CALLER: He was shot right here on Marshall and Tioga. On Marshall and Tioga.

9-1-1 OPERATOR: Alright. Hold on for rescue Ma'am.

*Audio tape: Philadelphia Police Radio, 25th District Band* (Mar. 21, 2009). The admissibility of evidence is solely within a trial court's discretion and will be reversed only if the trial court has abused that discretion. *Commonwealth v. Seilhamer*, 862 A.2d 1263 (Pa. Super. 2004). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c).

An excited utterance, an exception to the hearsay rule, is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Pa.R.E., Rule 803(2). The excited utterance exception requires an event or condition to be startling. Pa.R.E., Rule 803(2). Under this exception, an excited utterance:

> (1) need not describe or explain the startling event or condition; it need only *relate* to it; and (2), need not be made contemporaneously with, or immediately after, the startling event. It is sufficient if the stress of excitement created by the startling event or condition persists as a substantial factor in provoking the utterance.

Pa.R.E., Rule 803(2) cmt. (emphasis original). When a statement describes or explains an event or condition, "made while or immediately after the declarant perceived it," the statement is admissible as a present sense impression. Pa.R.E., Rule 803(1). Under this hearsay exception, the declarant's statements can concern observations of non-conditions or non-exciting events. *Commonwealth v. Cunningham*, 805 A.2d 566, 573 (Pa. Super. 2002). Unlike an excited

5

utterance, a present-sense-impression declarant "need not be excited or otherwise emotionally affected by the event or condition perceived." Pa.R.E., Rule 803(1). cmt. Despite what its identifying title suggests, a present sense impression statement need not be made simultaneously with the event in which it describes; rather, near contemporaneousness will suffice. *Id.* In addition, a present sense impression statement can be made over the telephone. *Commonwealth v. Hood*, 872 A.2d 175, 183 (Pa. Super 2005).

In the case at bar, the 9-1-1 statements plainly qualify for both hearsay exceptions. First, for excited utterance, the declarant's statements in the instant matter related to a violent shooting. The declarant placed the 9-1-1 call soon after the shooting while she was under the stress of excitement caused by that event; a body lay bleeding on the street in the near vicinity; and the declarant observed—while on the phone with the 9-1-1 operator—a possible armed and dangerous suspect attempting to flee from the scene.

For present sense impression, the declarant in the instant matter not only described in real time the make and color of the suspect's car as it fled, she also described in real time which street the suspect was currently driving on, and which street the suspect currently turned onto. The declarant also accurately described Arcenio's current location as he lay bleeding on the street. In addition, the declarant's choice of words assists in establishing the contemporaneousness of her statements in relation to the events in which she describes.[4] During the 9-1-1 call, the declarant

---

[4] Although courts have held that the trustworthiness of an excited utterance cannot be established by a declarant's assertion that he or she witnessed the event, courts have yet to explicitly apply this principle when evaluating a present sense impression. *Commonwealth v. Hood*, 872 A.2d 175, 183—85 (Pa. Super. 2005); *see also Commonwealth v. Upshur*, 764 A.2d 69, 76 (Pa. Super. 2000). Still, it should be noted that *Hood* and *Upshur* relate to whether the declarant *actually viewed the events* and not specifically to the contemporaneousness of the events perceived. In other words, if the principle in *Hood* and *Upshur* does apply to a present sense impression, *Hood* and *Upshur* do not expressly bar the use of the declarant's statements to establish the *timing* of the present sense impression statements.

6

used the phrase "right now" three times and also used the word "just" three times.[5] These phrases signify that the declarant relayed current circumstances, as she perceived them.

The Defense contends that the 9-1-1 statements lack sufficient corroboration to justify their admission via the hearsay exceptions. This argument lacks merit. First, the declarant's description of the fleeing vehicle mirrored the description provided by a witness later interviewed by police at the scene; in his statement to the police, the Defendant admitted to driving a car similar to that described by the declarant and the witness at the scene; based on the call log, the witness placed the 9-1-1 call soon after the shooting; and the declarant accurately identified the location—including the intersecting streets—where the police would later find the victim. These facts sufficiently corroborate that the declarant was at the scene and actually viewed the events in which she described. Thus, for the above-discussed reasons, the 9-1-1 statements are sufficiently corroborated and qualify as hearsay exceptions.

### b. The admission of the 9-1-1 recording did not violate the Defendant's right to confront the witnesses against him.

Whether 9-1-1 statements are admissible does not end with an analysis by way of the hearsay exceptions. The Constitution's Sixth Amendment provides that, in all criminal prosecutions, the accused shall have the right "to be confronted with the witnesses against him." U.S. Const. Amend VI. This is better known as the Confrontation Clause. In *Crawford v. Washington*, the Supreme Court reiterated the proposition that the Confrontation Clause is not limited to in-court testimony. *Crawford v. Washington*, 541 U.S. 36, 50 (2004). For out-of-court statements, the Confrontation Clause bars "admission of testimonial statements of a witness who

---

[5] The caller relayed that "somebody *just* got shot right here on Tioga [Street]"; that the "[suspect] *just* kept on straight" indicating the direction on the street in which the suspect was driving; and that the "[suspect] *just* made a left on Venango [Street]" (emphasis added). The word "just" can be defined as "*very recently; at this or that exact moment or time*. http://www.merriam-webster.com/dictionary/just.

7

did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 54.

In *Davis v. Washington,* the Supreme Court addressed whether a witness's statements made during a 9-1-1 call were testimonial hearsay. 547 U.S. 813 (2006). There, the Court refined the testimonial standard avowed in *Crawford* and held that statements made during a 9-1-1 call are *non*-testimonial when the "circumstances objectively indicat[e] that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency." *Id* at 822 (emphasis added).[6] The *Davis* Court reasoned that statements offered to police during a 9-1-1 call to resolve an on-going emergency are considered non-testimonial because these types of statements generally describe *current* circumstances, and not *past* events. *Id.* at 827. *Davis* also points out that statements elicited in an effort to establish the assailant's identity—so that dispatched officers might know whether they may encounter a violent felon—are not testimonial. *Id.* at 828; *see also Michigan v. Bryant,* 131 S.Ct. 1143, 1158 (2011) (holding that an "assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue.")

Another factor included in the *primary purpose* analysis is the importance of "informality" of the encounter between law enforcement and the witness. *Michigan v. Bryant,* 131 S.Ct. at 1160. Formality can alert the witness to focus on the possible future prosecutorial

---

[6] The existence of an ongoing emergency must be:

> objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause.

*Michigan v. Bryant,* 131 S.Ct. at 1157 n. 8. The Court also related that if the statement's primary purpose cannot be determined, the statement's admissibility "is the concern of state and federal rules of evidence, [and] not the Confrontation Clause." *Id.* at 1156.

8

use of his or her statements. *Id.* at 1166. For example, statements made to law enforcement at a police station may be deemed testimonial based not only on the location, but also on the formal interrogation used by the police. *Davis,* 547 U.S. at 827; *see also Crawford* , 541 U.S. 36. At the station, the environment would be safe and presumably calm. *Id.* There, the witness would surely be aware that his or her statements could potentially be used for the suspect's prosecution. Yet statements relayed near a crime scene, made when or immediately after the subject events occurred, may be deemed informal, thus not testimonial. *Michigan v. Bryant,* 131 S.Ct. at 1160; *Davis,* 547 U.S. at 827. Under these circumstances, a witness may not be acutely aware that the statements may be later used at trial.

In the case at bar, the *primary purpose* of the interrogation in the 9-1-1 call was to enable police assistance to meet an ongoing emergency. First, the witness undeniably faced an ongoing emergency at the time of the call: a victim of a violent shootout lay on the ground seriously wounded, requiring urgent aid; and a possible armed and dangerous suspect was about to flee from the scene.[7] Such circumstances are a veritable definition of an emergency. Also akin to *Davis*, the 9-1-1 operator's efforts were to establish the armed suspect's identity and location— this information was necessary so dispatched officers or emergency services would be aware of what they may encounter upon their arrival at the scene, including whether they might be encountering a dangerous felon. *See Michigan v. Bryant, supra.*

Furthermore, there was no level of formality in the conversation between the 9-1-1 operator and the witness. First, the 9-1-1 call took place mere moments after the shooting, not hours later. Second, the operator's questions were of a nature to elicit information to resolve a present emergency. Third, the interview did not take place in a safe environment (i.e., a police

---

[7] The caller relayed to the 9-1-1 operator that the "guy [meaning the suspect] is *about* to take off," which suggest that the suspect was still in the immediate vicinity. (emphasis added).

station). Finally, the witness was clearly frazzled by the chaos at the shooting scene. To illustrate the conversation's "un-serene" environment, on two occasions the witness gave non-responsive answers to the operator's questions, evidence that the witness may have been distracted by the exigency of the moment. Certainly, no aspect of this interrogation would have alerted the witness to focus on the possible future prosecutorial use of her statements.

*Davis* also articulated that once the emergency has been resolved, the non-testimonial statements end. *Davis*, 547 U.S. at 829. Here, the witness's statements to the 9-1-1 operator never reached a point where they were no longer about the exigency of moment. Throughout the duration of the 9-1-1 call, the victim required urgent medical aid and a possible armed and dangerous suspect was still in the vicinity. Thus, because the *primary purpose* of the questions, and the related statements, were to resolve an ongoing emergency, the admissibility of the 9-1-1 recording does not violate the Confrontation Clause. And because the statements also qualify as excited utterance and present sense impression hearsay exceptions—with sufficient corroboration—the statements are admissible.

## II. There was no evidence of prosecutorial misconduct.

### a. The Commonwealth's closing arguments did not exceed the bounds of propriety.

Next, the Defense argues that the Prosecutor committed a reversible error when he, during closing arguments, asked the jury, "did [Defense Counsel] ask the detective one thing about violence occurring to this man [the Defendant]?" The rhetorical question ostensibly referred to the Defendant's assertion that the detective, to compel the Defendant to sign an

10

inculpatory statement, had threatened and assaulted the Defendant with a wooden stick.[8] The

Defense claims that this question improperly shifted the burden of proof to the Defense.

Courts have held that "not every unwise or irrelevant remark made in the course of a trial

by a judge, a witness, or counsel . . . compel[s] the granting of a new trial." *Commonwealth v.*

*Goosby*, 301 A.2d 673, 674 (Pa. 1973); quoting *Commonwealth v. Phillips*, 132 A.2d 733 (Pa.

Super. 1957). Further, comments by a prosecutor "do not constitute reversible error unless the

unavoidable effect of such comments would be to prejudice the jury, forming in their minds

fixed bias and hostility toward the defendant so that they could not weigh the evidence

objectively and render a true verdict." *Commonwealth v. Von Cliff*, 397 A.2d 1173, 1176 (Pa.

1979), quoting *Commonwealth v. McNeal*, 319 A.2d 669, 673 (Pa. 1974) (citations omitted).

Whether a prosecutor's language violated this standard is not for appellant review. *Von*

*Cliff*, 397 A.2d at 1176, quoting *Commonwealth v. Simon*, 248 A.2d 289, 292 (Pa. 1968).

Rather, it is the Trial Judge's duty to rule upon the prosecutor's comments; and an appellant

court is limited in its review to whether the Trial Court abused its discretion. *Von Cliff*, 397 A.2d

at 1176. It is well recognized that a prosecutor "must have reasonable latitude in fairly

presenting a case to the jury, and that the trial judge must have reasonable discretion in deciding

whether the bounds of propriety have been exceeded." *Von Cliff*, 397 A.2d at 1176, quoting

*Commonwealth v. Cronin*, 346 A.2d 59, 62 (Pa. 1975).

Here, the Trial Court resolved that the Commonwealth's statement did not exceed the

bounds of propriety. The Commonwealth did not offer the rhetorical question to shift the burden

of proof to the Defense; instead, the Trial Court found that the Commonwealth used the

---

[8] The Defendant testified that the detectives, to force the Defendant to sign the inculpatory statement, "got a wooden stick and hit [him] with it." N.T. 2/19/2014 at 54.

11

rhetorical question to exemplify that no evidence supported the Defendant's claim that he signed the inculpatory statement under threat. This is a far cry from prosecutorial misconduct.

Assuming, *arguendo*, that the Commonwealth's statement was inappropriate, the Trial Court preemptively and sufficiently addressed the statement at the start of trial. When the trial began, the Court properly instructed the jury that "Defense counsel may or may not present evidence for the Defendant. As you were told before, the Defendant has no obligation to offer evidence or to testify." N.T. 2/12/2014 at 13. Further, before closing arguments, the Trial Court stressed to the jury that they were "not bound by the counsels' recollection of the evidence, nor [were they] bound by counsels' perception of what the evidence in the case shows." N.T. 2/20/2014 at 30–31. Therefore, the Trial Court's ruling should be affirmed.

b. **The Commonwealth did not commit prosecutorial misconduct as the line of question of Mr. Alvarado was permissible and did not play on the Jury's sympathies and emotions.**

The Defense next argues that the Commonwealth "played the sympathy and emotion card" by inquiring about Arcenio's medical condition and injuries. At trial, Arcenio's father, Adriel Alvarado, testified that he saw his son lying in a pool of blood. N.T. 2/12/2014 at 31. The Defense objected to this portion of the testimony on relevance grounds. The Court found the testimony relevant to establish *corpus*[9] and overruled the objection. *Id.* at 31. After the Court's ruling, the following exchange between Mr. Alvarado and the Commonwealth took place:

MR. ALVARADO: [Arcenio's] upper torso [was] all shot up.

THE COMMONWEALTH: Could you see the blood all through the upper torso?

MR. ALVARADO: I didn't see the blood—that you see all in the pavement because it was oozing out of him already.

---

[9] *Corpus delicti* means "the body of the crime." *Commonwealth v. Verticelli*, 706 A.2d 820, 822 (Pa. 1998). *Corpus delicti* is established by showing: (1) a specific injury or loss; and (2) a person's criminality was a source of that injury or loss. *Commonwealth v. Zugay*, 745 A.2d 639, 652 (Pa. Super. 2000).

12

THE COMMONWEALTH: When you say oozing out of him, what was oozing out of him?

MR. ALVARADO: Like a waterfall, man. His whole body, like.

THE COMMONWEALTH: Was it blood?

MR. ALVARADO: Yes.

THE COMMONWEALTH: Okay. That's all I'm asking you. . . .

N.T. 2/12/2014 at 31–32. Soon after, a second exchange took place:

THE COMMONWEALTH: When you saw [your son] hooked on the machines, did he have his shirt off?

MR. ALVARADO: He had it off.

THE COMMONWEALTH: And what could you see on his chest area?

MR. ALVARADO: The bullet holes, how they cut him up. He was so—when we went inside the room, he was opened. He was opened because he had blood. He had a blood clog [sic], so they didn't want to close him up. He was still opened up. And the holes, the holes like that, up in his torso, everywhere.

*Id.* at 35. Later, a third exchange:

THE COMMONWEALTH: Did you have any chance or attempt to talk to your son during the month and a half?

MR. ALVARADO: We kept telling him that we were praying for you, we praying. It's like talking to a piece of paper.

THE COMMONWEALTH: Did he have his eyes open at that time?

MR. ALVARADO: No.

*Id.* at 36. First, the remarks alleged to be prejudicial "must be read in the context of the case as a whole, with a particular view to the evidence presented and reasonable inferences drawn therefrom, in order to determine whether they are indeed prejudicial." *Commonwealth v. Dennis*, 460 A.2d 255, 259 (Pa. Super. 1983). To place the Commonwealth's questions and the witness's remarks in relative context, the Defendant's charges included, among other things, aggravated

13

assault. A person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another, *or causes such injury* intentionally, knowingly or recklessly under circumstances *manifesting extreme indifference to the value of human life*. 18 Pa.C.S.A. § 2702(A)(1) (emphasis added). For aggravated assault, evidence of injuries sustained by a victim can be an "indication of the force and violence used, a factor clearly relevant to the degree of harm intended by an assailant." *See Dennis*, 460 A.2d at 258 (holding that photographs of a victim lying in a hospital bed, eyes closed, with discoloration and swelling around his eye, were neither gruesome nor inflammatory, but were relevant and properly admitted). The record suggests that the Commonwealth elicited evidence of the victim's injuries to establish *Corpus* as well as to show the relevant degree of harm intended by the assailant. Therefore, because the evidence was relevant and competent, it was admissible.

Further, the record reflects that in none of the exchanges listed above did the Commonwealth prompt the witness to answer in a prejudicial manner. Assuming, for argument's sake, that portions of Mr. Alvarado's testimony were non-responsive, again, courts have held that "[not] every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel . . . compel[s] the granting of a new trial." *See Goosby, supra*. Further, a new trial is only required "when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial." *Id.* Nothing in the record reflects that the witness's responses— or the Prosecutor's questioning—meet this standard.

The Defendant also indicates that the Trial Court erred when it failed to give a curative instruction to the jury when Mr. Alvarado displayed, at times, emotion during his testimony. Indeed, Mr. Alvarado cried near the end of his testimony, and at one point was offered a glass of

14

water. N.T. 2/12/2014 at 44. In response to the showing of emotion, the Commonwealth asked for a brief pause, which the Trial Court granted. *Id.* 44–45. After the brief pause, the witness was able to continue his testimony. Nonetheless, at no time did defense counsel request a curative instruction relative to Mr. Alvarado's display of emotions. Moreover, the Trial Court did not find that Mr. Alvarado's emotional testimony warranted a curative jury instruction.

It is not uncommon for witnesses to express emotion during testimony, especially when a parent testifies to the events surrounding serious injuries to his child. Here, the Court did not perceive the showing of emotion by Mr. Alvarado as anything but genuine. It was within Trial Court's sound discretion to determine whether a curative instruction was necessary. *Commonwealth v. Sanchez,* 82 A.3d 943, 982 (Pa. 2013); *Commonwealth v. Pezzeca,* 749 A.2d 968 (Pa. 2000). Mr. Alvarado's crying was short-lived. The Trial Court did not feel Mr. Alvarado's showing of emotion prejudiced the jury and accordingly, the Trial Court felt that a curative instruction was unwarranted. *See Commonwealth v. McCloughan,* 421 A.2d 361 (Pa. Super. 1980) (holding that since the crying episode by a witness was brief and since the trial court, which observed the episode, obviously felt that the jury had not been prejudiced by it, the trial court did not abuse its discretion in refusing to declare a mistrial because of it.)

**III. The Court did not error by not including a witness instruction.**

Next, the Defense claims that the Trial Court erred by not charging the jury with a missing witness instruction after the Commonwealth failed to call the Complainant, Arcenio, as a witness. Courts have held that a Missing Witness Instruction is appropriate when:

> a potential witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative, then if such party does not produce the testimony of this witness, the jury may draw an inference that it would have been unfavorable.

15

*Commonwealth v. Evans*, 664 A.2d 570, 573 (Pa. Super. 1995), quoting *Commonwealth v. Manigualt*, 462 A.2d 239 (Pa. 1983). Courts have summarized six circumstances that preclude the issuance of a Missing Witness Instruction, which are as follows:

> (1) The witness is so hostile or prejudiced against the party expected to call him that there is a small possibility of obtaining unbiased truth; (2) the testimony of such a witness is comparatively unimportant, cumulative, or inferior to that already presented; (3) the uncalled witness is equally available to both parties; (4) there is a satisfactory explanation as to why the party failed to call such a witness; (5) the witness is not available or not within the control of the party against whom the negative inference is desired; and (6) the testimony of the uncalled witness is not within the scope of the natural interest of the party failing to produce him.

*Commonwealth v. Evans*, 664 A.2d 570, 574 (Pa. Super. 1995). To charge the jury with a Missing Witness Instruction, the witness must only be available to the Commonwealth and none of the exceptions apply. *Commonwealth v. Boyle*, 733 A.2d 633, 638 (Pa. Super. 1999); *Commonwealth v. Evans*, 664 A.2d 570, 574 (Pa. Super. 1995).

Here, the above-listed fourth exception is applicable as there is a satisfactory explanation as to why the Commonwealth failed to call Arcenio as a witness. As a result of the shooting, Arcenio suffered serious bodily injury (N.T. 2/19/2014 at 39), including paralysis from the chest down. N.T. 2/12/2014 at 38.[10] Because of significant health issues, he was unavailable to testify for both the Commonwealth and the Defense.

The Defense, however, argues that the Commonwealth had control over the witness, which would still require a Missing Witness Instruction. For its position, the Defense relies on *Commonwealth v. Echevarria*, 575 A.2d 620 (Pa. Super. 1990) and *Commonwealth v. Manigualt*, 501 Pa. 506, 462 A.2d 239 (Pa. 1983). Yet the Defense's position is perplexing as *Echevarria* involved a situation with a confidential informant—not applicable in the instant

---

[10] The Defendant is paralyzed from the thorax down through to his legs. N.T. 2/18/2014 at 125.

16

matter—and *Manigualt* supports a position held by the Commonwealth.[11] In *Manigualt*, the court held that if a party fails to call a witness and that witness is equally available to both parties, no Missing Witness Instruction is warranted. Here, like *Manigualt*, there is no indication that the witness was available only to the Commonwealth. *See Manigualt, supra.* There is also no evidence that the Commonwealth had exclusive control over the witness. The Defense knew the Complainant's identity and had an equal opportunity to call him to testify, but failed to do so: the Defense did not subpoena him; nor is there any indication that the Defense attempted to go to his residence. Thus, the Missing Witness Instruction was not warranted, and the Trial Court's ruling should be affirmed.

## CONCLUSION

Based on the evidence, testimony, and the foregoing discussion, the Trial Court's rulings should be affirmed on appeal.

BY THE COURT:

_____

SEAN F. KENNEDY, J.

---

[11] At trial, the Commonwealth argued that the Missing Witness Instruction was inapplicable as Arcenio was available to both the Commonwealth and the Defense; and, in the alternative, because of health issues, Arcenio was otherwise unavailable to both parties. N.T. 2/20/2014 at 5–6.